**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

**TENIKA S. CARTER,**

       **Plaintiff,**

    **v.**

**VNA, INC.,**

      **Defendant.**

**Civil Action No.  1:12-cv-000868**

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Emmett F. McGee, Jr. (Bar No. 08462)
Jennifer L. Curry (Bar No. 29038)
JACKSON LEWIS LLP
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
Phone: (410) 415-2000
Fax: (410) 415-2001
emmett.mcgee@jacksonlewis.com
jennifer.curry@jacksonlewis.com

*Counsel for Defendant, VNA, Inc.*

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF UNDISPUTED FACTS .......................................................3

        A.      VNA's Business.........................................................................................3

        B.      Carter's Employment At VNA ................................................................4

        C.      VNA's RIF Policy And Selection Criteria.............................................4

        D.      VNA's 2009 Reduction In Force .............................................................5

        E.      VNA's 2010 Reduction In Force .............................................................6

        F.      Carter And Bevans Applied For FMLA Leave......................................8

        G.      Carter And Others Notified Of Selection For Termination ..................9

        H.      Carter's Failure To Mitigate Damages ................................................10

                1.      Carter Failed to Apply For Other VNA Or MedStar System Positions
                        Prior To The Termination Of Her Employment .........................10

                2.      Carter Did Not Apply For VNA Or MedStar System Positions After
                        Her Employment Terminated ....................................................11

                3.      Carter Resigned From Subsequent Employment And Declined A
                        High Level Job Offer ................................................................12

        I.      The EEOC Concluded That Carter's Claims Are Meritless. .................13

III.    SUMMARY JUDGMENT STANDARD .......................................................13

IV.     ARGUMENT.....................................................................................................15

        A.      VNA Is Entitled To Summary Judgment On Carter's Pregnancy
                Discrimination Claim..............................................................................15

                1.      Carter Cannot Establish A *Prima Facie* Case Of Pregnancy
                        Discrimination.........................................................................17

                2.      Carter Has No Evidence To Demonstrate That VNA's Stated Reason
                        For Her Termination Was Pretextual.......................................19

i

B.    VNA Is Entitled To Summary Judgment On Carter's Claim Of FMLA Retaliation ..................................................................................................... 25

1.    Carter Effectively Withdrew Her FMLA Retaliation Claim During Her Deposition ........................................................................................ 25

2.    Even If Carter Had Not Withdrawn The Claim During Her Deposition, VNA Is Entitled To Summary Judgment On Carter's FMLA Retaliation Claim ......................................................................... 26

a.    Carter cannot establish a *prima facie* case of FMLA retaliation ... 26

b.    Even assuming, *arguendo*, that Carter could establish a *prima facie* case of FMLA retaliation, VNA has articulated a legitimate, non-retaliatory reason for her termination and she has no evidence of pretext ............................................................ 27

C.    Carter's Failure To Mitigate Her Damages Bars Any Recovery .......................... 29

V.    CONCLUSION .............................................................................................. 31

## TABLE OF AUTHORITIES

### Cases

*Allen v. Johnson*,
  2010 U.S. Dist. LEXIS 57979 (D. Md. June 10, 2010)................................................24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)....................................................................................................14

*Beale v. Hardy*,
  769 F.2d 213 (4th Cir. 1985) ......................................................................................22

*Berckeley Inv. Group Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006)..........................................................................................2

*Blackburn v. Thurston Motor Lines, Inc.*,
  982 F.2d 125 (4th Cir. 1992) ......................................................................................30

*Blankenship v. Buchanan Gen. Hospital*,
  140 F. Supp. 2d 668, 674 (D. Va. 2001)....................................................................27

*Bossalina v. Lever Bros., Inc.*,
  849 F.2d 604 (4th Cir. 1988) ......................................................................................29

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
  346 F.3d 514 (4th Cir. 2003) ......................................................................................31

*Brady v. Thurston Motor Lines, Inc.*,
  753 F.2d 1269 (4th Cir. 1985) ........................................................................29, 30, 31

*Brocklehurst v. PPG Indus. Inc.*,
  123 F.3d 890 (6th Cir. 1997) ......................................................................................21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..............................................................................................13, 14

*Conkwright v. Westinghouse Electric Corp.*,
  739 F. Supp. 1006 (D. Md. 1990) ..........................................................................22, 23

*Corti v. Storage Technology Corp.*,
  304 F.3d 336 (4th Cir. 2002) ......................................................................................18

*Cureton v. Montgomery County Bd. of Educ.*,
  2001 U.S. Dist. LEXIS 123160 (D. Md. Oct. 25, 2011)............................................27

*Daugherty v. Genesis Health Ventures of Salisbury, Inc.*,
  316 F. Supp. 2d 262 (D. Md. 2004) ...................................................................15

*Davis v. Dimensions Health Corp.*,
  639 F. Supp. 2d 610 (D. Md. 2009) ..................................................................24

*DeJarnette v. Corning, Inc.*,
  133 F.3d 293 (4th Cir. 1998) ..........................................................................16

*Diamond v. Colonial Life & Accident Ins. Co.*,
  416 F.3d 310 (4th Cir. 2005) ..........................................................................20

*Duke v. Uniroyal, Inc.*,
  928 F.2d 1431 (4th Cir. 1991) ........................................................................22

*EEOC v. Delight Wholesale*,
  973 F.2d 664 (8th Cir. 1992) ..........................................................................31

*Elam v. Regions Fin. Corp.*,
  601 F.3d 873 (8th Cir. 2010) ..........................................................................15

*Felty v. Graves-Humphreys Co.*,
  818 F.2d 1126 (4th Cir. 1987) ........................................................................13

*Foreman v. Weinstein*,
  485 F. Supp. 2d 608 (D. Md. 2007) .................................................................22

*Gairola v. Commonwealth of Virginia Dept. of General Services*,
  753 F.2d 1281 (4th Cir. 1985) ........................................................................19

*Gibson v. Old Town Trolley Tours of Washington D.C., Inc.*,
  160 F.3d 177 (4th Cir. 1998) ..........................................................................14

*Gilliam v. South Carolina Dep't of Juvenile Justice*,
  474 F.3d 134 (4th Cir. 2007) ..........................................................................19

*Goodman v. NSA, Inc.*,
  621 F.3d 651 (7th Cir. 2010) ............................................................................2

*Griffin v. Four Seasons Resorts and Hotels, Ltd.*,
  1999 U.S. Dist. LEXIS 3968 (S.D.N.Y. Apr. 12, 1999)...................................31

*Hawkins v. PepsiCo, Inc.*,
  203 F.3d 274 (4th Cir. 2000) ..........................................................................24

iv

*Healy v. New York Life Ins. Co.*,
  860 F.2d 1209 (3d Cir. 1988) ............................................................................21

*Henson v. Liggett Group, Inc.*,
  61 F.3d 270 (4th Cir. 1995) ...............................................................................23

*Hill v. Lockheed Martin Logistics Management, Inc.*,
  54 F.3d 277 (4th Cir. 2004) ..........................................................................22, 24

*Holmes v. e.spire Communications, Inc.*,
  35 F. Supp. 2d 657 (D. Md. 2001) ................................................................16, 19

*Hux v. City of Newport News*,
  451 F.3d 311 (4th Cir. 2006) .............................................................................24

*International Brotherhood of Teamsters v. United States*,
  431 U.S. 324 (1977) ..........................................................................................16

*Jimenez v. Mary Washington College*,
  57 F.3d 369 (4th Cir. 1995) ...............................................................................20

*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ..........................................................................................14

*McCaskey v. Henry*,
  461 Fed. Appx. 468 (4th Cir. 2012) ...................................................................26

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ...............................................................................16, 17, 26

*Mereish v. Walker*,
  359 F.3d 330 (4th Cir. 2000) .........................................................................21, 24

*Meyer v. United Air Lines*,
  950 F. Supp. 874 (N.D. Ill. 1997) ......................................................................31

*Miles v. Dell, Inc.*,
  429 F.3d 480 (4th Cir. 2005) .............................................................................26

*Mitchell v. Data General Corp.*,
  12 F.3d 1310 (4th Cir. 1993) .............................................................................18

*Moore v. Novo Nordisk, Inc.*,
  2012 U.S. Dist. LEXIS 138410 (D. Md. July 26, 2012) ......................................27

*Orenge v. Veneman*,
  218 F. Supp. 2d 758 (D. Md. 2002) ....................................................................24

*Page v. Bolger*,
  645 F.2d 227 (4th Cir. 1981) ...........................................................................21

*Pickworth v. Entrpreneurs' Org.*,
  261 Fed. Appx. 491 (4th Cir. 2008) ................................................................26

*Price v. Thompson*,
  380 F.3d 209 (4th Cir. 2004) ...........................................................................20

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ........................................................................................17

*Reeves v. Swift Transp. Co., Inc.*,
  446 F.3d 637 (6th Cir. 2006) ...........................................................................15

*Rowe v. Marley Co.*,
  233 F.3d 825 (4th Cir. 2000) ...........................................................................23

*Rudolph v. Hechinger Co.*,
  884 F. Supp. 184 (D. Md. 1995) .....................................................................18

*Sagar v. Oracle Corp.*,
  2012 U.S. Dist. LEXIS 169279 (D. Md. Nov. 26, 2012) ...............................22

*Santorocco v. Chesapeake Holding Co., LLC*,
  2010 U.S. Dist. LEXIS 58160 (D. Md. June 10, 2010) ..................................28

*Scherr v. Woodland Sch. Cmty. Consol. Dist. No. 50*,
  867 F.2d 974 (7th Cir.1988) ...........................................................................15

*Sennello v. Reserve Life Ins. Co.*,
  667 F. Supp. 1498 (S.D. Fl. 1987), *aff'd*, 872 F.2d 393 (11th Cir. 1989) ...................................31

*Shaffer v. ACS Government Services, Inc.*,
  454 F. Supp. 2d 330 (D. Md. 2006) ................................................................23

*Showe v. Md. Dep't of Pub. Safety & Corr. Servs.*,
  2009 U.S. Dist. LEXIS 77178, at *17 (D. Md. Aug. 28, 2009) .....................19

*Spivey v. Beverly Enterprises, Inc.*,
  196 F.3d 1309 (11th Cir. 1999) .......................................................................16

*Troupe v. May Dep't Stores Co.*,
  20 F.3d 734 (7th Cir. 1994) ........................................................................15

*Venugopal v. Shire Laboratories*,
  334 F. Supp. 2d 835 (D. Md. 2004) ............................................................23

*Wagner v. Dillar Dep't Stores, Inc.,*
  17 Fed. Appx. 141 (4th Cir. 2001) ..............................................................30

*Warren v. Halstead Indust., Inc.*,
  802 F.2d 746 (4th Cir. 1986), *aff'd on reh'g*, 835 F.2d 535 (4th Cir. 1998),
  *cert. denied,* 487 U.S. 1218 (1988) ............................................................17

*Williams v. Cerberonics, Inc.*,
  871 F.2d 452 (4th Cir. 1989) ......................................................................27

*Yashenko v. Harrah's NC Casino Company, LLC*,
  446 F.3d 541 (4th Cir. 2006) ......................................................................26

## **Statutes**

42 U.S.C. § 2000e, *et seq*...............................................................................15

42 U.S.C. § 2000e-5.......................................................................................29

42 U.S.C. § 2000e(k) ......................................................................................15

## LIST OF APPENDICES

Appendix 1:        Tenika Carter's Deposition Transcript

Appendix 2:        Affidavit of Traci Anderson

Appendix 3:        Suzanne Proctor's Deposition Transcript

Appendix 4:        Shelley Garfield's Deposition Transcript

Appendix 5:        Affidavit of Shelley Garfield

Appendix 6:        Reduction In Force Policy

Appendix 7:        Corinne Trancucci's Deposition Transcript

Appendix 8:        Affidavit of Kathy Miles

Appendix 9:        Affidavit of Suzanne Proctor

Appendix 10:       Tenika Carter's 2009 Performance Assessment

Appendix 11:       Carol Bevans' 2009 Performance Assessment

Appendix 12:       Tenika Carter's FMLA Approval Letter, April 15, 2010

Appendix 13:       Corinne Trancucci's Correspondence to Tenika Carter, June 9, 2010

Appendix 14:       Affidavit of Trish Backer-Micelli

Appendix 15:       List of Registered Nursing Positions at VNA, May 2010 to August 1, 2012

Appendix 16:       Affidavit of Alicia Janus

Appendix 17:       Affidavit of Izabella Janus

Appendix 18:       Tenika Carter's EEOC Charge

Appendix 19:       EEOC Correspondence to Tenika Carter

Appendix 20:       EEOC's Dismissal and Notice of Rights

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, VNA, Inc. ("VNA"), by and through its undersigned counsel, respectfully submits this Memorandum in Support of its Motion for Summary Judgment. Based on the undisputed facts, including Tenika Carter's ("Carter") own deposition testimony, VNA is entitled to summary judgment as a matter of law.[1]

## I.   INTRODUCTION

Carter's employment with VNA terminated on June 30, 2010, as a result of a Reduction-In-Force ("RIF"). The Complaint asserts that: (1) VNA terminated Carter because she was pregnant in violation of the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k); and/or (2) VNA unlawfully retaliated against her in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").

As confirmed by Carter in her deposition testimony, she has no facts to support her claims. Carter offers nothing other than her unsupported *belief* and *feeling* that the termination of her employment was somehow unfair:

A.   I *believe* that I was selected for termination because I was pregnant.

Q.   Is there any other reason that you believe that you were selected for termination?

A.   No.

…

Q.   What makes you believe that the fact that you were pregnant had anything at all to do with the decision to terminate your employment?

A.   For me…I *felt* as though my FMLA would protect my job, for when I would go out on maternity leave, I would have a job to return to. So I felt as though I was in a protected group, which I was not protected from the reduction in force.

---

[1] Discovery in this matter closed on November 30, 2012.

1

Q.     Is there anything else at all that makes you believe that your pregnancy had anything at all to do with the decision to terminate your employment?

A.     Nothing else that I can recall at this time.

(Carter depo. 164-166).[2]

In contrast to Carter's unsupported allegations, VNA has articulated a legitimate, non-discriminatory and non-retaliatory reason as to why Carter was selected for termination pursuant to the RIF.  VNA applied the selection criteria as prescribed in its written Reduction In Force Policy, and in accordance with that consistently applied policy, Carter was selected for inclusion in the RIF because she had significantly less departmental seniority than the other employee in her position at her hospital.

As has been observed, summary judgment is the "put up or shut up" moment in the lawsuit, at which time "the non-moving party is required to marshal and present the court with evidence she contends will prove her case.  And by evidence, we mean evidence on which a reasonable jury could rely."  *Goodman v. NSA, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).  *See also Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party.").  Carter has produced no evidence that VNA's legitimate, nondiscriminatory and non-retaliatory reason for her termination is pretext and that pregnancy discrimination or FMLA retaliation was the true reason. Carter relies only on her own self-serving belief, conjecture and speculation as to why she was terminated.  This is entirely insufficient.

Based on the undisputed facts, including Carter's own deposition testimony, VNA is entitled to summary judgment as a matter of law on both Carter's pregnancy discrimination and FMLA retaliation claims.

---

[2]     Tenika Carter's deposition testimony is cited as "(Carter depo. __)," and cited pages from Carter's deposition transcript are attached as Appendix 1.

2

## II.    STATEMENT OF UNDISPUTED FACTS[3]

### A.    VNA's Business

VNA partners with the various entities within the MedStar Health Inc. system (the "MedStar system")[4] to provide in-home healthcare services for homebound patients recently discharged from the hospital and for patients who are disabled or living with a chronic condition. (Carter depo. 101, 104; Anderson Aff. ¶ 3; Proctor depo. 10-11).[5]  These patients generally require skilled medical care on a regular basis and face significant hardship in leaving their home to obtain such care.  When a patient fitting these criteria is being prepared for discharge from a MedStar system hospital, his or her physician may write an order for at-home care and refer him or her to VNA to coordinate that care.  (Carter depo. 101-102; Anderson Aff. ¶ 3; Proctor depo. 11).  Based upon the physician's order, VNA will schedule and coordinate care of the patient once he or she returns home.  (Carter depo. 101-2; Garfield depo. 6; Garfield Aff. ¶ 3).[6]  This care may be provided directly by one of VNA's Clinical Field Nurses or may be arranged through an independent medical provider by one of VNA's Clinical Consultants.  (Carter depo. 101-2; Garfield Aff. ¶ 3).  To provide this service, VNA maintains offices in each MedStar system hospital, including the four Baltimore-area hospitals: Good Samaritan Hospital ("GSH"), Union Memorial Hospital ("UMH"), Franklin Square Hospital ("FSH") and Harbor Hospital. (Carter depo. 104; Garfield depo. 6; Garfield Aff. ¶ 2).

---

[3]    VNA assumes the truth of certain testimony of Carter only for the limited purposes of this Motion.

[4]    MedStar Health, Inc. is a not-for-profit regional healthcare system serving Maryland and the District of Columbia.  The MedStar system is comprised of several entities, such as hospitals and diversified healthcare providers, including VNA.

[5]    The Affidavit of Traci Anderson is attached as Appendix 2, and that Affidavit is cited as "(Anderson Aff. ¶ __)."  Suzanne Proctor's deposition testimony is cited as "(Proctor depo. __)," and cited pages from Proctor's deposition transcript are attached as Appendix 3.

[6]    Shelley Garfield's deposition testimony is cited as "(Garfield depo. __)," and cited pages from Garfield's deposition transcript are attached as Appendix 4.  The Affidavit of Shelley Garfield is attached as Appendix 5, and that Affidavit is cited as "(Garfield Aff. ¶ __)."

**B.      Carter's Employment At VNA**

Tenika Carter was hired by VNA on December 7, 2006, as a Clinical Field Nurse in the Baltimore-area.  (Carter depo. 99; Garfield Aff. ¶ 8).  On May 15, 2008, Carter accepted a new position as a Clinical Consultant and was assigned to work at GSH.[7]   (Carter depo. 96, 100; Garfield Aff. ¶ 8).  Clinical Consultants assigned to a MedStar system hospital (*i.e.,* GSH) are responsible for following the prescribed orders of physicians and to assist patients being discharged with coordinating their home care.  (Garfield Aff. ¶ 8).  At the time of Carter's move to the Clinical Consultant position at GSH, there was one other Clinical Consultant, Carol Bevans ("Bevans"), already assigned to GSH.  (Carter depo. 102-3; Garfield Aff. ¶ 8).

**C.      VNA's RIF Policy And Selection Criteria**

Over the years, VNA has implemented a number of RIFs.  In each case, VNA consistently has followed the same decision-making process and applied its written Reduction In Force Policy.  As the first step in the process, VNA identifies the particular sites at which positions will be eliminated.  (Anderson Aff. ¶ 5).  Next, separately focusing on each such site, VNA determines which and how many positions will be eliminated at the particular site.  (Anderson Aff. ¶ 5).  After the affected sites and positions have been identified, VNA then applies the selection criteria prescribed in its written Reduction In Force Policy to compare the employees in the affected positions at the particular sites to determine which employees will be subject to termination pursuant to the RIF.  (Anderson Aff. ¶¶ 5, 6).  In that regard, the Reduction In Force Policy provides:

> [W]hen there are fewer positions available than there are qualified employees who successfully meet competencies required for a given position, job eliminations will be based on the following factors and in the following order:

---

[7]      The Clinical Field Nurses and the Clinical Consultants assigned to one of the MedStar system's Baltimore-area hospitals work within VNA's Business Development Group.  (Garfield Aff. ¶ 2).

- performance assessments, including annual performance evaluations;
- department seniority; and
- company seniority.

*See* Reduction In Force Policy, attached as Appendix 6. These selection criteria are applied on a site-specific basis. (Anderson Aff. ¶ 6). In other words, when it comes to comparing employees first based on performance, and then based on seniority if performance is not determinative, employees are only compared to others working at the same site. (Anderson Aff. ¶ 6; Trancucci depo. 18-19).[8]

**D.     VNA's 2009 Reduction In Force**

In early 2009, VNA began experiencing a drop in its volume of business and, as a result, Traci Anderson ("Anderson"), President of VNA, was tasked with the responsibility of improving VNA's financial viability. (Anderson Aff. ¶ 7). After a thorough analysis of VNA's operations and expected financial results for 2009, Anderson determined that VNA's workforce needed to be downsized in a RIF. (Anderson Aff. ¶ 7). In implementing the RIF in June and July of 2009, Anderson relied on VNA's historical practice of first identifying the particular sites at which positions would be eliminated then determining which specific positions at those sites would actually be eliminated. (Anderson Aff. ¶ 7). Once the sites and positions to be affected by the RIF were identified, the selection criteria in VNA's Reduction In Force Policy were applied to determine which employees at those sites and in those positions identified would be subject to termination. (Anderson Aff. ¶ 7; Miles Aff. ¶ 6). [9] In total, thirty VNA employees were selected for termination in the 2009 RIF. (Anderson Aff. ¶ 8).

---

[8]     Corinne Trancucci's deposition testimony is cited as "(Trancucci depo. __)," and cited pages from Trancucci's deposition transcript are attached as Appendix 7.

[9]     The Affidavit of Kathy Miles is attached as Appendix 8, and that Affidavit is cited as "(Miles Aff. ¶ __)."

E.      **VNA's 2010 Reduction In Force**

        Despite reducing the VNA workforce significantly in the 2009 RIF, it was clear to Anderson by December 2009, that VNA needed to reduce its workforce even further.  (Anderson Aff. ¶ 9).  As a result, Anderson met with each of the VNA Vice Presidents, including Suzanne Proctor ("Proctor"), Vice President of the Business Development Group, to discuss VNA's options.  (Anderson Aff. ¶ 10; Proctor depo. 7; Proctor Aff. ¶ 4).[10]  Anderson informed Proctor and the other Vice Presidents that another RIF would be implemented in 2010 and asked that they each identify sites and positions at those sites that could contribute to the RIF.  (Anderson Aff. ¶ 10; Proctor depo. 7; Proctor Aff. ¶ 4).  Proctor thereafter met with each director in the Business Development Group, including Shelley Garfield ("Garfield"), Director of Business Development of the VNA operations at the Baltimore-area hospitals in the MedStar system, to analyze and identify sites that would be subject to the RIF.  (Proctor depo. 9; Garfield depo. 9).  As a Director of Business Development, Garfield was responsible for maintaining the operation of VNA's in-home coordination services at the MedStar system's four Baltimore-area hospitals, as well as supervising the Clinical Consultants at each of those hospitals.  (Proctor depo. 9; Garfield depo. 6).

        Proctor and Garfield discussed the fact that that the volume of referrals handled by VNA in the Baltimore area had been dropping.  (Proctor Aff. ¶ 6; Garfield Aff. ¶ 5).  Proctor and Garfield noted that the volume of referrals at two hospitals in particular, Union Memorial Hospital ("UMH") and Good Samaritan Hospital ("GSH"), had been dropping over the prior year.  (Proctor depo. 11-12; Proctor Aff. ¶ 6; Garfield Aff. ¶ 5).

---

[10]      The Affidavit of Suzanne Proctor is attached as Appendix 9, and that Affidavit is cited as "(Proctor Aff. ¶ __)."

After narrowing it down to either UMH or GSH, Proctor and Garfield then turned to more closely comparing the volume of referrals handled by VNA at those two hospitals, as well as the potential for improvement in the volume of referrals handled by those hospitals.  (Proctor depo. 12; Garfield depo. 9-10; Proctor Aff. ¶ 7; Garfield Aff. ¶ 6).  The volume of referrals handled on a monthly basis at UMH consistently was higher than the volume handled by GSH. (Proctor depo. 12; Garfield depo. 9-10; Proctor Aff. ¶ 7; Garfield Aff. ¶ 6).  Additionally, VNA was working on several new projects at UMH that were expected to significantly increase the referral volume in the near future.  (Proctor depo. 12; Garfield depo. 9-10; Proctor Aff. ¶ 7; Garfield Aff. ¶ 6).  The volume of referrals handled at GSH was lower than the volume handled by UMH, and there was nothing at the time (*i.e.,* a new project or referral initiative) to indicate that GSH's referral volume would improve in the near future.  (Proctor depo. 12; Garfield depo. 9-10; Proctor Aff. ¶ 7; Garfield Aff. ¶ 6).  Based upon this analysis, Proctor and Garfield determined that a position at GSH would be eliminated in the 2010 RIF.  (Proctor depo. 12-13; Proctor Aff. ¶ 7; Garfield Aff. ¶ 6).  Proctor and Garfield decided to eliminate a Clinical Consultant position at GSH because Clinical Consultants were solely responsible for handling referrals, the volume of referrals at GSH were down, and thus GSH could manage with one less Clinical Consultant.  (Proctor Aff. ¶ 7; Garfield Aff. ¶ 7).  This decision was made in mid- to late-March 2010.   (Proctor Aff. ¶ 7; Garfield Aff. ¶ 7).

With a site and position chosen for elimination, Garfield consulted with Kathy Miles ("Miles"), Employee Relations Manager, to apply the selection criteria in VNA's Reduction In Force Policy to determine which of the two Clinical Consultants at GSH – Carter or Bevans – would be terminated as part of the RIF.  (Garfield depo. 9-10; Garfield Aff. ¶ 11; Miles Aff. ¶ 4). The selection criteria first required that Carter and Bevans be compared by their performance

assessment scores.  (Garfield Aff. ¶ 11; Miles Aff. ¶ 6).  In this instance, Carter and Bevans received the same exact score – 544.5 – in their 2009 Performance Assessments.  (Carter depo. 113; Garfield depo. 26; Garfield Aff. ¶ 11).  Attached as Appendix 10 is a copy of Carter's 2009 Performance Assessment.  Attached as Appendix 11 is a copy of Bevans' 2009 Performance Assessment. Because their performance assessment scores were the same, the Reduction In Force Policy next called for Carter and Bevans to be compared by their departmental seniority. (Garfield Aff. ¶ 11; Miles Aff. ¶ 6).  Carter had been working in the Business Development Group for approximately four years.  (Garfield Aff. ¶ 11).  Bevans, on the other hand, had been working in the Business Development Group for approximately eleven years, since December 12, 1999.  (Garfield Aff. ¶ 11; Miles Aff. ¶ 6).  Since Bevans had greater departmental seniority, she was offered the opportunity to stay with VNA as a Clinical Consultant at GSH ahead of Carter.[11]   (Garfield depo. 29; Garfield Aff. ¶ 11; Miles Aff. ¶ 6).  Bevans accepted the opportunity to continue employment in the one remaining Clinical Consultant position and, as a result, Carter's employment was subject to termination pursuant to the RIF.  (Garfield Aff. ¶ 13; Miles Aff. ¶ 7).

**F.     Carter And Bevans Applied For FMLA Leave**

As explained above, Proctor and Garfield decided to eliminate a Clinical Consultant position at GSH in mid- to late-March 2010.  After that decision was made, but before any communication to affected employees, both Carter and Bevans applied for a leave of absence pursuant to the FMLA.  (Carter depo. 183-184; Garfield depo. 20-21; Garfield Aff. ¶ 10).  Carter notified Garfield that she was pregnant and submitted an application for FMLA leave in early

---

[11]     At the time that the Reduction In Force Policy's selection criteria were applied, Garfield did not believe Bevans would accept the opportunity to continue employment because the only remaining Clinical Consultant at GSH would need to work forty hours per week and Bevans had previously indicated that she did not want to work more than thirty-two hours per week.  (Garfield Aff. ¶ 12).  Garfield fully expected that Bevans would decline the opportunity and that Carter, therefore, would end up as the Clinical Consultant at GSH.  (Garfield Aff. ¶ 12).

8

April 2010. (Carter depo. 183-4, 204; Garfield depo. 20-21; Garfield Aff. ¶ 10). Carter's application for FMLA leave was approved on April 15, 2010. (Carter depo. 183-184). A copy of the letter sent to Carter approving her FMLA leave request is attached as Appendix 12.

Around the same time, Bevans also notified Garfield that she needed to have surgery in late June 2010 and that she intended to apply for a lengthy medical leave of absence. (Garfield Aff. ¶ 10). Bevans' request for medical leave was approved to begin on June 23, 2010. (Garfield Aff. ¶ 10). Garfield, thus, became aware that both Carter and Bevans would be taking medical leave for significant periods of time after she and Proctor made the decision to eliminate a Clinical Consultant position at GSH, but before the Reduction In Force Policy selection criteria were applied to identify which employee would be subject to termination.[12] (Garfield Aff. ¶¶ 7, 10-11).

**G.      Carter And Others Notified Of Selection For Termination**

On May 12, 2010, Garfield and Miles met with Carter to notify her that a Clinical Consultant position at GSH was going to be eliminated in the RIF and that, pursuant to the selection criteria in the Reduction In Force Policy, her employment would terminate effective June 30, 2010, if she did not find another position at VNA or elsewhere at prior to that date. (Carter depo. 117, 149; Garfield Aff. ¶ 14; Miles Aff. ¶ 8).

Carter was one of thirty-two VNA employees, from the Business Development Group and other departments, who were terminated as a result of the 2010 RIF. (Anderson Aff. ¶ 11).

---

[12]      Also, Proctor herself requested to take a medical leave of absence. (Proctor Aff. ¶ 8). Her request was made long before the decision to eliminate a Clinical Consultant at GSH was made and was scheduled to begin in mid-April 2010. (Proctor Aff. ¶ 8).

**H.**     **Carter's Failure To Mitigate Damages**

**1.**     **Carter Failed To Apply For Other VNA Or MedStar System Positions Prior To The Termination Of Her Employment**

On May 12, 2010, when Carter was notified of the impending RIF, she also was informed that she was eligible to apply for other job openings at VNA and elsewhere within the MedStar system, and she was encouraged to pursue to those job opportunities.  (Carter depo. 117-8; Garfield Aff. ¶ 14; Miles Aff. ¶ 9).  Miles recommended that Carter contact Corinne Trancucci ("Trancucci"), VNA's Director of Human Resources, to discuss her options regarding finding another position at VNA or elsewhere within the MedStar system.  (Carter depo. 117-8; Garfield Aff. ¶ 14; Miles Aff. ¶ 9).  Garfield echoed Miles' recommendation.  (Carter depo. 118; Garfield Aff. ¶ 14; Miles Aff. ¶ 9).

On June 8, 2010, almost one month after being notified of her pending termination, but before her employment actually terminated, Carter met with Trancucci for the first time.  (Carter depo. 140; Trancucci depo. 38-39).  During that meeting, Trancucci told Carter that she should apply for vacant positions at VNA and elsewhere within the MedStar system and to contact Trancucci afterward to "ensure that [she would be] interviewed."  (Carter depo. 120; *see also* Trancucci depo. 36-37).  Trancucci also specifically discussed with Carter that there was a vacant Clinical Field Nurse position at VNA.  (Trancucci depo. 38-39).  Carter, however, told Trancucci that she was not interested in returning to a field nurse position.  (Trancucci depo. 38-39).  Nevertheless, to reiterate the opportunity, Trancucci followed up her meeting with Carter by sending her a letter, dated June 9, 2010, confirming that a Clinical Field Nurse position was vacant and providing her with the details of the position.  (Trancucci depo. 25-27).  A copy of Trancucci's letter to Carter is attached as Appendix 13.  Carter never applied for the vacant position.  (Carter depo. 133-134).

Carter next met with Trish Backer-Micelli ("Backer-Micelli"), VNA's Vice President, Human Resources, on June 16, 2010.  (Carter depo. 141; Backer-Micelli Aff. ¶ 5).[13]  At that meeting, Backer-Micelli similarly urged Carter to apply for vacant positions at VNA and elsewhere within the MedStar system and to follow-up with Trancucci once she applied so that she would be guaranteed an interview.  (Carter depo. 142-3; Backer-Micelli Aff. ¶¶ 7, 8).  A list of all vacant nursing positions at VNA from May 2010 to August 1, 2012 is attached as Appendix 15.  Backer-Micelli also specifically encouraged Carter to consider returning to a field nurse position since there were a number of vacancies at the time.  (Backer-Micelli Aff. ¶ 7, 8).  Carter, however, expressed to Backer-Micelli that she had no interest in a return to working in the field, including a Clinical Field Nurse position.  (Backer-Micelli Aff. ¶ 7).

Since Carter elected not to apply for any other positions at VNA, or elsewhere within the MedStar system, her employment at VNA ended on June 30, 2010.  (Carter depo. 133-134; Garfield Aff. ¶ 15; Miles Aff. ¶ 10; Backer-Micelli Aff. ¶ 8).

**2.    Carter Did Not Apply For VNA Or MedStar System Positions After Her Employment Terminated**

Following her termination, Carter similarly failed to apply for any vacant positions at VNA or elsewhere within the MedStar system, despite being aware that such job openings existed.[14]  (Carter depo. 133-134).  In fact, Carter discovered that a Clinical Consultant position at one of the other Baltimore-area hospitals was being advertised as vacant in August 2010, but

---

[13]     The Affidavit of Trish Backer-Miceli is attached as Appendix 14, and that Affidavit is cited as "(Backer-Miceli Aff. ¶ __)."

[14]     From May 12, 2010, the date Carter was notified of her termination, through June 30, 2010, the date of Carter's termination, there were twelve (12) vacant Registered Nurse positions in the Baltimore-area at VNA.  *See* Appendix 15.  From July 1, 2010 to present, there have been fourteen (14) vacant Registered Nurse positions in the Baltimore-area at VNA.  *Id.*

Carter did not apply for or otherwise express any interest in the position.  (Carter depo. 134-135).[15]

### 3.    Carter Resigned From Subsequent Employment And Rejected A High Level Job Opportunity

Carter eventually sought and obtained work with one of VNA's outside contractors, All About Home Care LLC ("All About Home Care").  (Carter depo. 62-65; A. Janus Aff. ¶¶ 4, 5; I. Janus Aff. ¶¶ 3, 4).[16]  All About Home Care hired Carter as an Admissions Nurse on December 23, 2010.  (Carter depo. 65-66; A. Janus Aff. ¶ 5; I. Janus Aff. ¶ 4).  As an Admissions Nurse at All About Home Care, Carter could accept or reject as many assignments as she wanted and was given the option of restricting the geographical area in which she worked to only specific locations.  (I. Janus Aff. ¶ 4).  An Admissions Nurse at All About Home Care generally is offered and can accept enough assignments during the course of a week to work at least forty hours and to earn approximately $2,000 per week.  (I. Janus Aff. ¶ 5).  Despite being offered enough assignments to cover a forty-hour work week, Carter accepted just three days' worth of assignments over the period of two months.  (A. Janus Aff. ¶¶ 7-9; I. Janus Aff. ¶¶ 7-10).

Additionally, All About Home Care even offered Carter a full-time salaried position as the Director of Nursing, which she turned down.  (Carter depo. 67-69; A. Janus Aff. ¶ 6).  Carter completed her last assignment for All About Home Care on February 18, 2011.  (A. Janus Aff. ¶ 9; I. Janus Aff. ¶ 9).  Soon thereafter, Carter notified All About Home Care that she would not be accepting any more assignments, instead choosing to stay home full-time to take care of her children.  (A. Janus Aff. ¶¶ 10, 11; I. Janus Aff. ¶ 10).

---

[15]    Carter stated during her deposition that she discovered the vacant Clinical Consultant position in August 2010, when she searched VNA's website to see what was available.  (Carter depo. 131-134).  Even though she claims that she went to the website to see if any positions were open, once she found an open position, she decided not to apply.  (Carter depo. 133-134).

[16]    The Affidavit of Alicja Janus is attached as Appendix 16, and that Affidavit is cited as "(A. Janus Aff. ¶ __)."  The Affidavit of Izabella Janus is attached as Appendix 17, and that Affidavit is cited as "(I. Janus Aff. ¶ __)."

Carter did not return to work again until she accepted a part-time position at Oakcrest Assisted Living Facility in April 2011, and she continues to work there today on a full-time basis.  (Carter depo. 88-89).

**I.**      **The EEOC Concluded That Carter's Claims Are Meritless**

Carter filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on October 26, 2010, alleging pregnancy discrimination and FMLA retaliation.  (Carter depo. 172).  A copy of the EEOC Charge filed by Carter is attached as Appendix 18.  After a thorough investigation, the EEOC found that there was no merit to Carter's claims, and, on December 21, 2011, the EEOC dismissed her Charge.  (Carter depo. 172).  Attached as Appendix 19 is the EEOC's letter to Carter informing her of its conclusions. Attached as Appendix 20 is the Dismissal and Notice of Rights issued to Carter by the EEOC. Despite the EEOC's dismissal, Carter filed suit against VNA raising the same allegations of pregnancy discrimination and FMLA retaliation that the EEOC found to be meritless.  (Carter depo. 172-173).

**III.     SUMMARY JUDGMENT STANDARD**

"Recent cases of the Supreme Court have made increasingly clear…the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses from proceeding to trial.'"  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  As the Supreme Court stated in *Celotex*:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action"…  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.

13

*Celotex*, 477 U.S. at 323-24.

In *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), the Supreme Court explained the non-moving party's burden in responding to a motion for summary judgment as follows:

> [The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts… In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*… Where the record taking as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Id.* at 586-87 (emphasis in original) (internal quotation marks omitted). "If the evidence [submitted by a party opposing summary judgment] is merely colorable…or is not significantly probative…summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to survive a motion for summary judgment. *Id.* at 252. *See also Gibson v. Old Town Trolley Tours of Washington D.C., Inc.*, 160 F.3d 177, 182 (4th Cir. 1998) ("A jury may not…be allowed to infer [discrimination] from evidence that does no more than suggest it as a possibility."). Here, there is not even a scintilla of evidence to support Carter's claims, let alone the type of "significantly probative" evidence that is necessary to avoid summary judgment.

## IV.   ARGUMENT

### A.   VNA Is Entitled To Summary Judgment On Carter's Pregnancy Discrimination Claim

Carter asserts that VNA violated the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), when it terminated her employment as a result of the RIF.  Congress passed the PDA in 1978, specifying that sex discrimination, banned pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, includes discrimination on the basis of pregnancy.  As a result, "the PDA provides no substantive rule to govern pregnancy discrimination," but brings discrimination on the basis of pregnancy within the existing statutory framework prohibiting sex-based discrimination under Title VII.  *Scherr v. Woodland Sch. Cmty. Consol. Dist. No. 50*, 867 F.2d 974, 978 (7th Cir.1988).

In asserting that she should not have been terminated as part of the RIF, Carter in effect claims that VNA should have deviated from its historical practice and written policy. Essentially, Carter claims that she should have received preferential treatment because she was pregnant, and the fact that she had less seniority than the other Clinical Consultant at GSH should not have been considered.  Contrary to this assertion, Title VII, as amended by the PDA, does not entitle a pregnant employee to preferential treatment.  As this Court acknowledged in *Daugherty v. Genesis Health Ventures of Salisbury, Inc.*, 316 F. Supp. 2d 262, 265 (D. Md. 2004), "the clear weight of precedent is that an employer is not required to treat disability arising from pregnancy *more favorably* than it treats other forms of temporary disability."  In other words, "[e]mployers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994). *See also Elam v. Regions Fin. Corp.*, 601 F.3d 873, 879 (8th Cir. 2010) ("The PDA does not create substantive rights to preferential treatment."); *Reeves v. Swift Transp. Co., Inc.*, 446 F.3d 637, 643 (6th Cir. 2006) ("The district court correctly noted that [the plaintiff's] view of the law demands preferential, not equal, treatment, and therefore finds no support in the [PDA].");

*Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999) ("The PDA does not require that employers give preferential treatment to pregnant employees.").

"A claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." *Holmes v. e.spire Communications, Inc.*, 135 F. Supp. 2d 657, 661 (D. Md. 2001) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 297 (4th Cir. 1998)). In this case, Carter is proceeding under the disparate treatment theory of discrimination. The essence of disparate treatment is that "[t]he employer simply treats some people less favorably than others *because of* their race, color, religion, sex, or national origin." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15 (1977) (emphasis added). As the Supreme Court has stated, "[p]roof of discriminatory motive is critical." *Id. See also Reeves*, 446 F.3d at 642 ("The legal theory [plaintiff asserting a pregnancy discrimination claim] has chosen – disparate treatment – requires her to allege and prove discriminatory intent."); *Holmes*, *supra* ("Plaintiff bears the burden of establishing that Defendants discriminated against her 'because of her pregnancy.'"). To prevail on her discrimination claim, Carter must prove intentional discrimination – not simply that she was pregnant and terminated, but that she was terminated because she was pregnant. In this case, there is no such evidence of intentional discrimination. Rather, the undisputed facts are that the selection criteria in VNA's Reduction In Force Policy were applied in an objective, non-discriminatory manner and in accordance with VNA's historical practice.

The standard three-step analysis of Title VII discrimination claims set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), applies to Carter's Title VII pregnancy discrimination claim. Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. If the plaintiff fails to satisfy all the

16

elements of a *prima facie* case, the defendant is entitled to summary judgment. If, however, the plaintiff satisfies the threshold requirements of a *prima facie* case, the defendant must proffer an explanation for the actions taken. "The defendant need not persuade the court that it was actually motivated by the proffered reasons; it need only articulate – not prove – a legitimate, nondiscriminatory reason for its action." *Warren v. Halstead Indust., Inc.*, 802 F.2d 746, 752 (4th Cir. 1986), *aff'd on reh'g*, 835 F.2d 535 (4th Cir. 1988), *cert. denied,* 487 U.S. 1218 (1988). Once the defendant articulates a legitimate reason for its actions, the burden shifts back to the plaintiff, who is required to prove that the defendant's proffered justification is merely a pretext, and that the challenged actions actually were taken *because of* the plaintiff's pregnancy. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). Thus, the "ultimate question," as it is in "every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Id.* at 153.

As explained below, Carter cannot satisfy the threshold requirement of establishing a *prima facie* case of intentional pregnancy discrimination. Furthermore, VNA has articulated a legitimate, nondiscriminatory reason for its action, and Carter has no facts proving that the reason was merely pretext for intentional pregnancy discrimination. As such, VNA is entitled to summary judgment.

### 1.     Carter Cannot Establish A *Prima Facie* Case Of Pregnancy Discrimination

To establish a *prima facie* case of pregnancy discrimination in the context of a RIF, Carter must show that (1) she was pregnant; (2) she was selected from a larger group of candidates; (3) she was performing at a level substantially equivalent to the lowest level of that in the group retained; and (4) the selection process produced a residual work force that contained some unprotected persons who were performing at a lower level or had less seniority than she.

17

*Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993).[17]  While Carter may be able to satisfy the first, second, and third elements of the required *prima facie* showing, her claim fails because she cannot satisfy the fourth element, which ultimately is fatal to her pregnancy discrimination claim.

To satisfy the fourth element of a *prima facie* case of pregnancy discrimination in the context of a RIF, Carter is required to demonstrate that a non-pregnant employee was allowed to continue her employment as a Clinical Consultant at GSH, despite the fact that (1) her position was identified for elimination in the RIF, (2) she had a lower performance assessment score than Carter, and/or (3) she had less departmental seniority than Carter.  *Mitchell*, 12 F.3d at 1315. Carter has no such evidence.  As explained above, there was only one other Clinical Consultant at GSH – Bevans – at the time of the RIF, and Carter had the same performance assessment score as Bevans from the year prior.  (Carter depo. 113; Garfield Aff. ¶ 11; Miles Aff. ¶ 6).  *See* Appendices 10 and 11.  Also, Carter had significantly less departmental and company seniority than Bevans.  (Carter depo. 161; Garfield Aff. ¶ 11; Miles Aff. ¶ 6).  Thus, it is undisputed that there was no non-pregnant Clinical Consultant at GSH who had a lower performance assessment score or less seniority than Carter yet survived the RIF nevertheless.[18]

---

[17]    Although *Mitchell* concerned an ADEA claim, the elements delineated by that Court as necessary to establish a *prima facie* claim in the RIF context have been applied to other types of discrimination claims, including claims of gender discrimination.  *See, e.g., Corti v. Storage Technology Corp.*, 304 F.3d 336, 340 n.6 (4th Cir. 2002) (applying *Mitchell* elements to Title VII claim of gender discrimination); *Rudolph v. Hechinger Co.*, 884 F. Supp. 184 (D. Md. 1995) (applying *Mitchell* elements to Title VII claim of pregnancy discrimination).

[18]    Carter alleges that two Clinical Consultants at other MedStar system hospitals - Jennifer McCarley and Patricia Armijo – should have been subject to termination instead of her based on the fact that she had more seniority than both of them.  Neither Ms. McCarley nor Ms. Armijo, however, were assigned to GSH at the time of the RIF.  (Miles Aff. ¶ 11; Garfield Aff. ¶ 16).  As explained at length, the RIF decisions were entirely site-specific. Thus, neither Ms. McCarley's nor Ms. Armijo's positions were subject to elimination and they were not considered for termination in the RIF.  (Miles Aff. ¶ 11; Garfield Aff. ¶ 16).  Furthermore, even if Ms. McCarley and Ms. Armijo had been working at GSH at the time of the RIF, neither was performing at a lower level than Carter, which was the first factor in the selection criteria from the Reduction In Force Policy to determine which employee would be subject to termination.  (Garfield Aff. ¶ 16; Miles Aff. ¶ 11).

Because Carter failed to name a single similarly-situated non-pregnant employee who received more favorable treatment (*i.e.,* was not selected for termination despite being a Clinical Consultant at GSH with a lower performance assessment score and/or less seniority than Carter), she cannot satisfy an essential element of a *prima facie* case of disparate treatment, and VNA, therefore, is entitled to summary judgment.  *Showe v. Md. Dep't of Pub. Safety & Corr. Servs.,* 2009 U.S. Dist. LEXIS 77178, at \*17 (D. Md. Aug. 28, 2009) (summary judgment granted for employer in pregnancy discrimination case because plaintiff offered no evidence that employer treated similarly-situated non-pregnant employees more favorably than pregnant employees); *Gilliam v. South Carolina Dep't of Juvenile Justice,* 474 F.3d 134, 142-43 (4th Cir. 2007) (same); *Holmes,* 135 F. Supp. 2d at 662-63 (same).

As the Fourth Circuit has stated, "[e]stablishment of the *prima facie* case is not a requirement that can be overlooked by the court or side stepped by the aggrieved employee under…Title VII."  *Gairola v. Commonwealth of Virginia Dept. of General Services*, 753 F.2d 1281, 1288 (4th Cir. 1985).  Because Carter cannot satisfy the required elements of a *prima facie* case with properly supported facts, VNA is entitled to summary judgment.

## 2.     Carter Has No Evidence To Demonstrate That VNA's Stated Reason For Her Termination Was Pretextual

Assuming, *arguendo*, that Carter could establish a *prima facie* case of pregnancy discrimination, VNA still is entitled to summary judgment because it has articulated a legitimate, nondiscriminatory reason for terminating Carter.  Namely, Carter was terminated, along with thirty-one other VNA employees, as a result of the 2010 RIF after VNA used its business judgment to identify a site and position to be eliminated and applied its objective Reduction In Force Policy selection criteria to compare the employees at that site and in that position to determine who should be subject to termination.  More specifically, VNA decided to eliminate a

19

Clinical Consultant at GSH, a decision which Carter does not challenge.  (Carter depo. 155).
There were two Clinical Consultants at GSH – Carter and Bevans.  (Miles Aff. ¶ 5; Garfield Aff.
¶ 8).  Carter and Bevans were compared first by their performance assessment scores from the
previous year – which were exactly the same – and then by their departmental seniority.  (Miles
Aff. ¶ 6; Garfield Aff. ¶ 11).  Carter was subject to termination based on the application of the
objective selection criteria prescribed by the Reduction In Force Policy and the fact that she had
significantly less seniority than her only comparator.  (Miles Aff. ¶ 6; Garfield Aff. ¶ 11).

Because VNA has articulated a legitimate, nondiscriminatory reason for Carter's
termination pursuant to the RIF, the burden then shifts to Carter to offer sufficient evidence that
the articulated reason for her termination is pretextual.  *See Diamond v. Colonial Life &
Accidental Inc. Co.*, 416 F.3d 310, 320 (4th Cir. 2005) (summary judgment for defendant
employer affirmed on discrimination claim where plaintiff failed to produce "sufficient evidence
of pretext 'to avert summary judgment'"); *Price v. Thompson*, 380 F.3d 209, 215 (4th Cir. 2004)
(explaining that a plaintiff must be able to make a strong showing of pretext in order to survive
summary judgment).  In order to demonstrate that VNA's decision was pretextual, Carter must
prove "*both* that the reason was false, *and* that discrimination was the real reason."  *Jimenez v.
Mary Washington College*, 57 F.3d 369, 378 (4th Cir. 1995).  She can do neither.

Carter has no evidence that VNA's stated reason for selecting her for the RIF was pretext
and that VNA actually singled her out because she was pregnant.  Carter does not in any way
challenge the decision to eliminate a Clinical Consultant position at GSH.  (Carter depo. 155).
Nor could Carter conceivably challenge that decision, considering that the decision was made
before anyone knew that Carter was pregnant or may be requesting some type of leave of
absence.  (Garfield Aff. ¶¶ 7, 10).  Carter admits that no one at VNA ever said or did anything to

20

suggest that they would discriminate against her or anyone else because they were pregnant. (Carter depo. 168). Carter further admits that VNA's historical practice in a RIF situation has been to apply the Reduction In Force Policy selection criteria (performance assessment, department seniority, company seniority) to compare only employees at the specific site where the position is being eliminated, and that is exactly what VNA did in this case. (Carter depo. 162-163).

Instead, Carter's only argument is that VNA should have deviated from its policy and historical practice and terminated some other, less senior Clinical Consultant who never worked at GSH and instead worked at a different hospital where, for completely legitimate business reasons, it was determined that no positions should be eliminated. (Carter depo. 163-164). Simply because Carter would interpret or apply the Reduction In Force Policy differently (albeit incorrectly) than VNA does absolutely nothing to establish pretext. As the Fourth Circuit has correctly observed, "[t]he very nature of a RIF is that some workers must be let go, and difficult decisions have to be made." *Mereish v. Walker*, 359 F.3d 330, 338-39 (4th Cir. 2000). *See also Page v. Bolger,* 645 F.2d 227, 230 (4th Cir. 1981) (stating that employers legally must be able to make employment RIF decisions that disfavor qualified employees "on the basis of comparative evaluation of their qualifications with those other applicants."); *Brocklehurst v. PPG Indus. Inc.*, 123 F.3d 890, 896 (6th Cir. 1997) ("In a RIF, qualified employees are going to be discharged."); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988) (stating that "the essence of a RIF is that competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired"). Thus, VNA has the right to exercise its judgment to create, interpret, and apply policies in the manner it sees fit to operate its business, including during occasions such as a RIF. *See Sagar v. Oracle Corp.,* 2012 U.S. Dist. LEXIS

169279, * 13 (D. Md. Nov. 26, 2012) (observing "that in employment discrimination cases involving a reduction in force, it is not the court's duty to second guess the business judgment of defendant's employees or managers") (quoting *Conkwright v. Westinghouse Electric Corp.*, 739 F. Supp. 1006, 1017 (D. Md. 1990)); *Duke v. Uniroyal, Inc.*, 928 F.2d 1431 (4th Cir. 1991) (acknowledging that a business should have the autonomy to decide which employees to terminate in a reduction-in-force based upon the future needs and business requirements of the employer).

Carter has no evidence showing that VNA's articulated reason for selecting her for termination pursuant to the RIF was pretext and pregnancy discrimination was the true reason. While Carter may *believe* that her selection for termination in the 2010 RIF had something to do with her pregnancy, such a *belief* is entirely insufficient to defeat summary judgment. *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (a party opposing summary judgment "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another"); *see also Foreman v. Weinstein,* 485 F. Supp. 2d 608, 612 (D. Md. 2007) ("In the employment discrimination context, a subjective, even if genuine, belief of discrimination will not shield a nonmoving plaintiff from a grant of summary judgment."). Instead, Carter is required to "produce *sufficient evidence* upon which one could find that 'the protected trait…actually motivated the employer's decision.' The protected trait 'must have actually played a role in the employer's decisionmaking process and held a determinative influence on the outcome.'" *Hill v. Lockheed Martin Logistics Mgmt.,* 354 F.3d 277, 286 (4th Cir. 2004) (citations omitted) (emphasis added). Carter may disagree with her selection for termination but she has proffered no other evidence that the decision was based on any discriminatory animus. *See Shaffer v. ACS Government Services, Inc.*, 454 F. Supp. 2d 330, 336 (D. Md. 2006) ("Although Plaintiff may

disagree with Defendant's opinion…or the wisdom of the decision to discharge him, such disagreement does not make the decision illegal…").

Not only does Carter have no probative evidence of pregnancy discrimination, the undisputed facts belie any allegation of pregnancy discrimination.  For example, when a Clinical Consultant position at GSH was eliminated, Carter was encouraged to apply for other positions at VNA and elsewhere within the MedStar system.  If there was any intent or desire to terminate Carter because she was pregnant, they certainly would not have provided such opportunities for Carter to continue her employment.  Absent sufficient evidence of pretext, it is not the province of this Court to examine the correctness of VNA's decision to terminate Carter's employment pursuant to the RIF.  *See Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000) ("[Personnel decisions are] the kind of business decision that we are reluctant to second-guess."); *DeJarnette*, 133 F.3d at 299 ("[T]his Court 'does not sit as some kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.'"); *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 277 (4th Cir. 1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization…"); *Venugopal v. Shire Laboratories*, 334 F. Supp. 2d 835, 845 (D. Md. 2004) (stating that "district courts do not act as "super-personnel departments, second-guessing employers' business decisions"); *Conkwright*, 739 F. Supp. at 1017 (observing "that in employment discrimination cases involving a reduction in force, it is not the court's duty to second guess the business judgment of defendant's employees or managers").

Carter's failure to show pretext means that VNA is entitled to summary judgment on her pregnancy discrimination claim.  *See Hux v. City of Newport News*, 451 F.3d 311 (4th Cir. 2006)

(summary judgment affirmed because plaintiff made insufficient showing of pretext); *Hill*, 354 F.3d at 287 ("However, even if it could be said that a *prima facie* case had been stated, Hill could not prevail because Lockheed articulated a legitimate, nondiscriminatory reason for the termination decision, and Hill has come forward with no evidence to demonstrate that the reason proffered by Lockheed was a pretext for discrimination on the part of its relevant decisionmakers."); *Mereish*, 359 F.3d at 339 (holding that employer was entitled to judgment as a matter of law because plaintiff failed to produce significant evidence of pretext); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274 (4th Cir. 2000) (judgment for defendant as a matter of law affirmed because plaintiff offered insufficient evidence of pretext); *Allen v. Johnson*, 2010 U.S. Dist. LEXIS 57979, at *4 (D. Md. June 10, 2010) (granting summary judgment to defendant where, although plaintiff had set forth a *prima facie* case, plaintiff had not shown that defendant's proffered non-discriminatory reason was pretext for unlawful discrimination); *Davis v. Dimensions Health Corp.*, 639 F. Supp. 2d 610, 618 (D. Md. 2009) (in granting summary judgment for employer in Title VII case, court stated that "Defendant has presented legitimate, non-discriminatory reasons for Plaintiff's termination and Plaintiff has failed to show any evidence of pretext."); *Orenge v. Veneman*, 218 F. Supp. 2d 758, 765 (D. Md. 2002) (plaintiff established *prima facie* case of discrimination, but summary judgment granted to defendant because plaintiff failed to establish pretext).

**B.      VNA Is Entitled To Summary Judgment On Carter's Claim Of FMLA Retaliation**

In addition to the claim of pregnancy discrimination, the Complaint alternatively alleges that Carter's selection for termination was a result of retaliation against for her for applying for and taking FMLA leave.   During her deposition, however, Carter effectively withdrew her

FMLA retaliation claim, which should require dismissal of the claim.   (Carter depo. 164).

Nonetheless, even assuming that Carter had not withdrawn her FMLA retaliation claim and that

she could establish a *prima facie* case of FMLA retaliation, Carter has no evidence of pretext

sufficient to withstand summary judgment.

     **1.**     **Carter Effectively Withdrew Her FMLA Retaliation Claim During Her Deposition**

The baseless nature of Carter's FMLA retaliation allegations became apparent during her

deposition when she essentially withdrew her claim.   Specifically, when Carter was directly

questioned about why she believes she was terminated, she stated that "[she] felt [she] was being

discriminated against because [she] was *pregnant*," making absolutely no mention of FMLA

retaliation.   (Carter depo. 164).   Later in the deposition, Carter again was directly questioned

about the reason she believes she was terminated, and she again stated:

> A.     I believe I was selected for termination because I was *pregnant*.
>
> Q.     Is there any other reason that you believe you were selected?
>
> A.     No.
>
> …
>
> Q.     Okay.   But…you're not claiming it was because you, that you were terminated because you were on FMLA leave or had asked for FMLA leave, you're claiming that it was because you were *pregnant*, correct?
>
> …
>
> A.     I believe that's true.

(Carter depo. 164-165).

Carter's own statements about her belief as to the basis for her termination, including the

fact that she admitted that she does not believe that her application for FMLA played a role in

her selection for termination, completely negate the claim of FMLA retaliation initially raised in

her Complaint.  VNA should not be required to defend a claim that Carter no longer is asserting herself.  Thus, VNA is entitled to summary judgment on Carter's FMLA retaliation claim.

**2.      Even If Carter Had Not Withdrawn The Claim During Her Deposition, VNA Is Entitled To Summary Judgment On Her FMLA Retaliation Claim**

**a.      Carter cannot establish a *prima facie* case of FMLA retaliation**

Absent direct evidence of retaliation, claims made under the FMLA follow the aforementioned *McDonnell Douglas* burden-shifting framework.  *See Yashenko v. Harrah's NC Casino Company, LLC,* 446 F.3d 541, 50-51 (4th Cir. 2006) ("FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of *McDonnell Douglas*…").  Thus, for Carter to succeed on her retaliation claim, she must first establish a *prima facie* case of disparate treatment.  This she cannot do because the only remaining Clinical Consultant at GSH, Bevans, also applied for medical leave and is thus in the same protected class as Carter.  *See Miles v. Dell, Inc.*, 429 F.3d 480, 488 (4th Cir. 2005) ("it seems evident to us that a plaintiff must ordinarily show that she was replaced by someone outside her protected class" because "replacement within the protected class gives rise to an inference of non-discrimination with respect to the protected status"); *McCaskey v. Henry*, 461 Fed. Appx. 268 (4th Cir. 2012) (plaintiff's claim of discrimination fails because a member of plaintiff's same protected class was promoted into her position after her termination); *Pickworth v. Entrepreneurs' Org.*, 261 Fed. Appx. 491 (4th Cir. 2008) (plaintiff alleging pregnancy discrimination could not satisfy fourth prong of *prima facie* case since her replacement was also pregnant).  Indeed, it would make little sense for VNA to choose to subject

Carter to termination because she requested FMLA leave when the Clinical Consultant who was chosen to stay at GSH had also requested FMLA leave.[19]

> **b.      Even assuming, *arguendo*, that Carter could establish a *prima facie* case of FMLA retaliation, VNA has articulated a legitimate, non-retaliatory reason for her termination and she has no evidence of pretext**

Assuming, *arguendo,* that Carter had not withdrawn her FMLA retaliation claim during her deposition, and assuming further that she could establish a *prima facie* case of FMLA retaliation, VNA has articulated a legitimate, non-retaliatory reason, described at length above, and the burden now shifts back to Carter to prove pretext and that the real reason she was terminated was because she applied for FMLA.  This she cannot do.

To show that VNA's reason was pretextual, "the weakness of the employer's explanation, standing alone, is not sufficient; rather the employee must produce affirmative evidence of [retaliatory] motive or affirmative evidence that the employer's proffered explanation is simply unworthy of credence."  *Blankenship v. Buchanan Gen. Hospital*, 140 F. Supp. 2d 668, 674 (D. Va. 2001).  Not only does the record, including Carter's deposition testimony, show that there was nothing pretextual about the RIF, it also shows that VNA was more than accommodating in providing Carter, and others, medical leave.  For example, Carter admitted that Garfield, her supervisor and the individual most involved in applying the Reduction In Force Policy selection criteria in this instance, encouraged her to apply for FMLA once she learned she was pregnant:

---

[19]      Additionally, Carter cannot simply rely upon the fact that there was  a short period of time between the date she requested FMLA leave and the date she was terminated as a result of the RIF, because "timing is not determinative of establishing a causal connection at the summary judgment stage." *Cureton v. Montgomery County Bd. of Educ.,* 2011 U.S. Dist. LEXIS 123160, at \*16 (D. Md. Oct. 25, 2011) (citing *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989)).  "The FMLA 'does not protect an employee on leave from an adverse employment decision that would have occurred had she not taken leave." *Moore v. Novo Nordisk, Inc.*, 2012 U.S. Dist. LEXIS 138410, at \*24 (D. Md. July 26, 2012) (internal citation omitted).  In this instance, the record clearly reflects that Carter would have been selected to be eligible for termination as a result of the RIF, regardless of whether she had applied for FMLA or not.  Without something more than a closeness in time between her application for FMLA and her termination, Carter cannot demonstrate causal connection.

> Q.     Did you talk to anyone about your…need for FMLA leave or need for a leave of absence in connection with your pregnancy or your childbirth?
>
> A.     To Charlotte [Phipps] and Shelley [Garfield].  Shelley Garfield wanted to make sure that I was aware that that option was available to me.
>
> Q.     Are you saying that, once you told Shelley Garfield that you were pregnant, she told you that you…should apply for FMLA leave?
>
> A.     Which I was already aware of, yes.

(Carter depo. 184).  Further examples include the following:

- Carter admitted during her deposition that she had applied for and taken FMLA leave in the past while working for VNA and was not subjected to any retaliation as a result.[20]  (Carter depo. 199-202).

- Carter also admitted during her deposition that a Clinical Consultant at another hospital, Patricia Armijo, whom she alleges should have been subject to termination before her in the RIF, was out on FMLA leave, from May 12, 2010 through June 20, 2010, at the time the RIF was implemented,.  (Carter depo. 163-164; Miles Aff. ¶ 11).

- Bevans, the only other Clinical Consultant at GSH, applied for a medical leave of absence around the same time that Carter applied for, and was granted, FMLA leave.  (Garfield Aff. ¶ 10).  Bevans was out of work on medical leave from June 23, 2010 through August 3, 2010.  (Garfield Aff. ¶ 10).

- Proctor, the Vice President of the Business Development Group, was out on medical leave for her own medical issues at the time the decision to terminate Carter in the RIF was made.  (Proctor Aff. ¶ 8).

Simply put, Carter has offered absolutely no evidence of pretext and, in fact, she provided testimony during her deposition that portrayed VNA as being supportive and accommodating of her taking FMLA leave.  *See Santorocco v. Chesapeake Holding Co., LLC,* 2010 U.S. Dist. LEXIS 58160, at *8 (D. Md. June 10, 2010) (summary judgment granted for defendant employer on FMLA retaliation claim, where "Plaintiff provided no evidence showing that Defendant held any discriminatory motive towards Plaintiff for taking medical leave,

---

[20]     In fact, Carter applied for FMLA leave in 2007 and was out of work for several weeks.  (Garfield Aff. ¶ 9). Not only was Carter not retaliated against for taking FMLA leave but she was selected for a Clinical Consultant position the following year.  (Carter depo. 199-201; Garfield Aff. ¶ 9).

and…Plaintiff has not shown that Defendant's proffered reason is pretextual").  Thus, even if Carter had *not* withdrawn her claim during her deposition, the record clearly reflects that Carter has no evidence that the RIF was pretext for retaliating against her for applying for and taking FMLA leave.  As a result, Carter's claim of FMLA retaliation fails and VNA is entitled to summary judgment on that claim as well.

## C.     Carter's Failure To Mitigate Her Damages Bars Any Recovery

In the event that this Court does not grant VNA summary judgment for the reasons discussed above, VNA submits that Carter still is not entitled to any recovery because, as a matter of law, she completely failed to mitigate her damages. *See Bossalina v. Lever Bros., Inc.,* 849 F.2d 604 (4th Cir. 1988) (upholding summary judgment for employer because employee's admitted failure to mitigate damages was legally sufficient to bar any recovery for alleged discrimination).

It is well-settled that a Title VII plaintiff has a duty to mitigate damages by exercising reasonable diligence to locate other suitable employment substantially equivalent to that which she was denied and maintain such a job once it is located. *See Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1273 (4th Cir. 1985) (holding Title VII plaintiff cannot remain idle after an unlawful discharge and receive back pay for that period where she was not actively seeking employment); *see also* 42 U.S.C. § 2000e-5 ("[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable"). Where a plaintiff fails to meet her mitigation obligations, she "should be said to have voluntarily removed [herself] from the job market or the work place and forfeited [her] right to back pay." *Brady,* 753 F.2d at 1277.

Although Carter admits that she was encouraged to apply for other positions at VNA and elsewhere in the MedStar system, she also admits that she did not apply for a single vacant position at VNA or elsewhere in the MedStar system prior to her termination.[21]   (Carter depo. 133-134).  Carter also admits that she did not look for work during the entire month of July 2010, and when she found a vacancy posted on the VNA website in August 2010, she refused to apply. (Carter depo. 131-132).  Then, when Carter finally secured employment elsewhere, she not only failed to accept enough assignments to work full-time, but she refused an offer for a full-time salaried position at that company, and voluntarily terminated her employment less than two months later so that she could stay at home full-time to care for her children.  (A. Janus Aff. ¶¶ 6-10; I. Janus Aff. ¶¶ 7-10).

VNA should not be liable for any damages which are not the result of discrimination or retaliation but are a result of "[a] plaintiff who remain[ed] idle instead of seeking employment." *Wagner v. Dillard Dep't Stores, Inc.*, 17 Fed. Appx. 141, 153 (4th Cir. 2001).  In this case, any income allegedly lost by Carter was due to her choice not to seek other employment to replace her VNA job.  Not only did Carter fail to apply for any vacancies at VNA or elsewhere within the MedStar system prior or subsequent to her termination, when she did obtain employment elsewhere, she rejected an opportunity for a high level, salaried position.  She voluntarily resigned from that employment just two months later, citing personal reasons.  Based on her actions, or failure to act, Carter has not, as a matter of law, mitigated her alleged damages and, for this reason alone, she is barred from any recovery on her claims.  *Blackburn v. Thurston Motor Lines, Inc.,* 982 F.2d 125, 129 (4th Cir. 1992) (back pay award capped where plaintiff voluntarily removed himself from the job mark for personal reasons); *E.E.O.C. v. Delight*

---

[21]     The Clinical Field Nurse position Trancucci discussed with Carter and confirmed in writing, had a starting pay rate of $29.65 per hour.  *See* Appendix 13.  At the time of her termination, Carter was earning the exact same amount per hour - $29.65.  (Backer-Micelli Aff. ¶ 7).

*Wholesale,* 973 F.2d 664, 670 (8th Cir. 1992) (back pay award period tolled after plaintiff voluntarily quit new job due to personal reasons, including her health and a desire to spend more time with her daughter); *Sennello v. Reserve Life Ins. Co.,* 667 F. Supp. 1498, 1519 (S.D. Fl. 1987), *aff'd,* 872 F.2d 393 (11th Cir. 1989) (finding failure to mitigate during period of unemployment due to tumor-related illness which rendered plaintiff incapable of work); *Brady,* 753 F.2d at 1278 (back pay period tolled where plaintiff quits subsequent employment for personal reasons unrelated to job or as a matter of personal convenience); *Griffin v. Four Seasons Resorts and Hotels, Ltd,* 1999 U.S. Dist. LEXIS 3968 (S.D.N.Y. April 12, 1999) (finding failure to mitigate where plaintiff rejected comparable position so that she could relocate to Australia to attend to her terminally ill mother); *Meyer v. United Air Lines,* 950 F. Supp. 874, 877 (N.D. Ill. 1997) (finding failure to mitigate where plaintiff chose not to accept comparable employment based on personal considerations relating to child care).

## V.    CONCLUSION

As this Court and the Fourth Circuit have repeatedly stated, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims…from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).  Now before the Court on summary judgment are claims of pregnancy discrimination and FMLA retaliation that clearly have no factual or evidentiary basis, with Carter essentially admitting during her deposition that only her belief and speculation as to why she was selected for termination pursuant to a RIF serve as the basis for her claims.  While Carter may genuinely believe that she was selected for termination because she was pregnant and/or because she applied for and took FMLA leave, such belief is immaterial and by no measure rebuts VNA's legitimate, nondiscriminatory and non-retaliatory reason for terminating Carter.  Indeed, what is

obvious is that Carter, despite an opportunity for full discovery, has no facts or evidence that the reason given for her RIF selection is false and no facts or evidence showing that pregnancy discrimination and/or FMLA retaliation was the true reason. As such, Carter's claims fail as a matter of law and VNA is entitled to summary judgment.

WHEREFORE, for the foregoing reasons, Defendant VNA, Inc. respectfully requests that summary judgment be entered in its favor on all claims, and that it be awarded the costs and attorneys' fees incurred in defending this action.

Respectfully submitted,
JACKSON LEWIS LLP


Dated: January 2, 2013              /s/
                                    Emmett F. McGee, Jr. (Bar No. 08462)
                                    Jennifer L. Curry (Bar No. 29038)
                                    JACKSON LEWIS LLP
                                    2800 Quarry Lake Drive, Suite 200
                                    Baltimore, Maryland 21209
                                    Phone: (410) 415-2000
                                    Fax: (410) 415-2001
                                    emmett.mcgee@jacksonlewis.com
                                    jennifer.curry@jacksonlewis.com

                                    *Counsel for Defendant, VNA, Inc.*

4813-5341-0066, v. 5

32